Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile:  (213) 330-7152
Email: christopherp@hbsslaw.com

Jake Berman (SBN 327179)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email:  jakeb@hbsslaw.com

*Attorneys for Plaintiffs*
*Rick Landers and Salinas Zarling, Co-Administrators for*
*Estate of Mikyley Rae Reitz*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK LANDERS AND SALINAS ZARLING, CO-ADMINISTRATORS FOR THE ESTATE OF MIKYLEY RAE REITZ,<br><br>        Plaintiffs,<br><br>    v.<br><br>FORD MOTOR COMPANY,<br><br>        Defendant. | Case No. 2:23-cv-915<br><br>**COMPLAINT FOR DAMAGES** |

COMPLAINT FOR DAMAGES
003330-11/2173687 V1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     PARTIES ........................................................................................... 6

        A.      Plaintiffs ............................................................................... 6

        B.      Defendant ............................................................................. 6

III.    JURISDICTION AND VENUE ........................................................ 6

IV.     STATEMENT OF FACTS ................................................................ 7

        A.      The Roof-Crush Defect ........................................................ 7

        B.      Ford knew of the Roof-Crush Defect and never disclosed
                the Roof-Crush Defect to Plaintiff .................................... 17

                1.      Ford knew the relationship between roof strength
                        and rollover injury severity before the Roof-Crush
                        Defect Vehicles were developed. ............................ 17

                2.      Ford ignored the importance of roof strength in
                        preventing serious injury and death when designing
                        the Roof-Crush Defect Vehicles. ............................ 21

                3.      Ford reduced the roof strength of PHN131 vehicles
                        to save money. ........................................................ 28

                4.      Ford's ownership of Volvo provided further
                        evidence the Roof-Crush Defect Vehicles were
                        unsafe. ..................................................................... 31

        C.      Facts Unique to Plaintiffs' Claims .................................... 34

V.      TOLLING OF THE STATUTE OF LIMITATIONS ....................... 36

        A.      Delayed Discovery Rule Tolling ........................................ 36

VI.     CAUSES OF ACTION .................................................................... 37

FIRST CAUSE OF ACTION ...................................................................... 37

COMPLAINT FOR DAMAGES          -i-

STRICT PRODUCT LIABILITY ..................................................................... 37

PRAYER FOR RELIEF ................................................................................ 40

JURY DEMAND ............................................................................................ 41

Plaintiffs Rick Landers and Salinas Zarling ("Plaintiffs"), individually and as the Co-Administrators for the Estate of Mikyley Reitz ("Ms. Reitz" or "Decedent"), by and through their attorneys, based on their individual experiences, the investigation of counsel, and information and belief, bring this complaint herein against Ford Motor Company ("Ford" or "Defendant"), and allege as follows:

## I.    INTRODUCTION

1.    The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car when the manufacturer learns of a defect that implicates serious safety issues. Ford breached these fundamental duties when it sold Super Duty pick-up trucks that it knew had a dangerously weak roof structure. Ford knew these roofs would collapse in the event of a roll-over accident but hid this defect from consumers for years.

2.    Ford designed the model years 1999–2016 Ford Super Duty pick-up trucks (the "Roof-Crush Defect Vehicles") with a roof that is instantly crushed in the event of a rollover accident, resulting in paralysis, grave injury, and death to vehicle occupants (the "Roof-Crush Defect").

3.    A picture of a Super Duty after a rollover accident best illustrates the devastating effects of the Roof-Crush Defect:



COMPLAINT                                    -1-

4.      Prior to the development of the Roof-Crush Defect Vehicles, Ford's internal testing and safety evaluations show that Ford knew rollovers were far more deadly than other types of accidents. These documents also show that Ford knew strong vehicle roofs were fundamental to minimizing death and serious injury in a rollover accident.[1]

5.      Federal regulators, the military, and scientists around the world reached the same conclusion—rollover accidents caused grave occupant injuries and stronger roofs would increase occupant protection.[2]

6.      Ford exploited a lack of government oversight and repeatedly weakened the roof structure on Super Duty trucks to save money on labor and tooling costs.[3]

7.      In the years of development leading to the release of the 1999 PHN131 chassis—the platform used by all Roof-Crush Defect Vehicles—Ford weakened almost every component of the roof structure to save money. Specifically, Ford:

- Approved the deletion of the front header outer from the PHN131 vehicle's design, which saved $3.50 per vehicle and $500,000 in tooling costs but weakened the windshield header.[4]

- Redesigned and redrew the roof bows (roof reinforcements). The new bow metal was 0.8 mm thick, downgauged (reduced in thickness) from 0.9 mm. This was a reduction in thickness of 10.1%.[5]

---

[1] *See*, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[2] *See*, Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022); Monash University study titled *Rollover Crash Study – Vehicle design and occupant injuries*, available at: https://www.monash.edu/muarc/archive/our-publications/reports/muarc065 (last visited Sept. 23, 2022).

[3] *See*, *Taylor v. Ford*, 1:06-cv-00069 (D. Me.), Dkt. No. 86.

[4] *Id.* at 27.

[5] *Id.* at 28.

COMPLAINT FOR DAMAGES          - 2 -

- Authorized a downgauge from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[6]

- Downgauged the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and resulted in a cost savings of $0.05 per bow or $0.10 cents per vehicle.[7]

- Downgauged the A-Pillar (the part of the vehicle to which the windshield and front door hinges are attached) from 2.5 to 2.4 to 2.35mm thick.[8] This was downgauge of 6%, achieved a cost savings of $0.70 per vehicle and no tooling cost.[9]

- Later, further downgauged the A-pillar from 2.35 mm to 2.2 mm. This was a downgauge of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.[10]

- Authorized the replacement of the Boron steel rear door front vertical beam with a vertical beam made of mild steel. Boron steel is 4 or 5 times stronger than normal steel.[11] Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[12]

- Authorized the downgauge of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgauge resulted in a savings of $0.48 per door or $0.96 per vehicle.[13]

8.     Ford never conducted any testing to determine how much weaker these changes made Super Duty roofs.[14] And Ford's ownership of Volvo provided further

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 30.

[12] *Id.* at 29.

[13] *Id.* at 30.

[14] *Id.* at 31.

COMPLAINT FOR DAMAGES        - 3 -

evidence that Roof-Crush Defect Vehicles were unsafe.[15] Specifically, Ford's engineers in the Volvo division emphasized the importance of a strong roof structure with high integrity that would resist deformation.[16]

9.     Though Ford knew of the Roof-Crush Defect prior to selling the Super Duty trucks at issue, it did nothing to promptly warn owners and lessees. Instead, when confronted with cases claiming a defect existed, Ford asserted the false claim that roof strength does not prevent injuries in rollover crashes. Often, when a case alleged injury or wrongful death, Ford entered into secret settlements with victims and their families to hide the deadly nature of its roof design.[17]

10.     Indeed, Ford knew about the Roof-Crush Defect well before the Roof-Crush Defect Vehicles went to market. Ford's knowledge is evidenced by: (1) its own internal investigations and documents from years before the release of the first Roof-Crush Defect Vehicle as further described below; (2) the rigorous pre-launch testing of the Roof-Crush Defect Vehicles; (3) the direct and public reports of deadly accidents involving Roof-Crush Defect Vehicles; (4) Ford's investigation of accidents involving the Roof-Crush Defect Vehicles; and (5) Ford's practice of secretly settling lawsuits involving such accidents, which hid the dangerous nature—and Ford's knowledge—of the Roof-Crush Defect from the public.

11.     Consequently, the Roof-Crush Defect exposed Ms. Reitz to an unreasonable risk of paralysis, grave injury, and death if her vehicle were to be involved in a rollover accident: a risk that materialized and resulted in her death as described below.

---

[15] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 29, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[16] *Id*.

[17] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

COMPLAINT FOR DAMAGES        - 4 -

12.     Ms. Reitz's catastrophic injury and death is the direct result of a roof design that Ford knew was extraordinarily weak. And these weak roofs are still unremedied by Ford. Not only did Ford fail to disclose the Roof-Crush Defect to Ms. Reitz before her use of the Roof-Crush Defect Vehicles, it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Roof-Crush Defect—e.g., damage to a vehicle and paralysis, grave injury, or death to persons in the vehicle or another vehicle—should the Roof-Crush Defect Vehicle become involved in an accident.

13.     The dangerous and deadly design of the Roof-Crush Defect Vehicles finally gained national attention on August 19, 2022, when a jury in Georgia awarded $1.7 billion in punitive damages to the family of Melvin and Voncile Hill, who were killed when the roof of their 2002 F-250 Super Duty was crushed in a rollover accident.[18]

14.     A vehicle that is knowingly designed to fail and introduces an unreasonable risk of paralysis, grave injury, or death in a foreseeable and common type of accident is not fit for its ordinary purpose and is not properly designed. When a vehicle manufacturer can eliminate a grave safety defect on a vehicle model line but instead chooses to save manufacturing costs and fails to warn purchasers of this known and deadly Roof-Crush Defect, such manufacturer engages in a depraved and deadly fraud for which it should be held accountable.

15.     Plaintiff brings this case for the wrongful death of Mikyley Reitz, including claims of Product Liability, Negligence and Wrongful Death. In addition, Plaintiffs seek general, special and punitive damages.

---

[18] *See*, *Roof Strength on Older Ford Trucks Called into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj .com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

## II.   PARTIES

**A.   Plaintiffs**

16.   Rick Landers is the natural father of Mikyley Reitz and is a resident of Las Vegas, Nevada.

17.   Salinas Zarling is the natural mother of Mikyley Reitz and is a resident of Coeur d'Alene, Idaho.

18.   On January 23, 2023, Rick Landers and Salinas Zarling were appointed Co-Administrators of the Estate of Mikyley Reitz by a California Superior Court.

19.   Decedent, Mikyley Rae Reitz ("Decedent" or "Ms. Reitz") was a resident of Paso Robles, California. She was 25-years old at the time of her death. Ms. Reitz was a barrel racer in the Rodeo and worked as an administrative assistant.

20.   When not otherwise specified, the term "Plaintiffs" shall refer to the named Plaintiffs collectively and in their capacity as co-administrators for the Estate of Mikyley Reitz.

**B.   Defendant**

21.   Defendant Ford Motor Company ("Defendant" or "Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. Ford is authorized to conduct business in the State of California and was at all times authorized and/or qualified to do business, and was and is doing business, in the State of California, and designed, manufactured, marketed, distributed, and/or sold the Roof-Crush Defect Vehicle and its component parts and systems as alleged herein.

## III.   JURISDICTION AND VENUE

22.   Jurisdiction is proper pursuant to 28 U.S.C. § 1332. There exists complete diversity between the parties and the amount in controversy exceeds $75,000.00.

COMPLAINT FOR DAMAGES         - 6 -

23.     This court also has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint occurred in the State of California, Defendant is authorized to do business in the State of California, Defendant has intentionally availed itself of the markets available in the State of California. Consequently, Defendant has extensive contacts with the State of California.

24.     The court further has jurisdiction because Plaintiffs voluntarily submit to the jurisdiction of this court concerning the allegations in this Complaint and decedent was a resident of California.

25.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts and omissions giving rise to Plaintiffs' claims, including the incident in which the Decedent died, occurred therein.

26.     Because of the substantial interest of the State of California to regulate businesses, activities and/or wrongful conduct occurring and/or emanating from within its borders, the laws of the State of California apply to Plaintiffs' claims.

## IV.     STATEMENT OF FACTS

**A.     The Roof-Crush Defect**

27.     A picture is worth a thousand words. Below are pictures of Roof-Crush Defect Vehicles that were involved in rollover accidents:

COMPLAINT FOR DAMAGES          - 7 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







COMPLAINT FOR DAMAGES          - 8 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR DAMAGES        - 10 -



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR DAMAGES        - 11 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT FOR DAMAGES        - 12 -

28.     As multiple juries and courts have concluded in a host of personal injury and wrongful death lawsuits, the roof design in 1999–2016 Ford Super Duty trucks (which all share the PHN-131 design platform) is dangerous because the roofs are easily crushed in rollover accidents, causing paralysis and other grave and fatal injuries to vehicle occupants.[19]

29.     The complaints, trial briefs, orders, findings of fact, and other pleadings in these cases convincingly establish a disturbing timeline evidencing that Ford not only knew that the Super Duty trucks had unsafe and inadequate roof strength, but since there was no applicable standard regulating roof strength, Ford purposefully downgraded roof strength to save manufacturing costs and thereby enhance its profits. These facts establish that Ford had safer alternative designs available, yet it chose not to utilize them in the Super Duty trucks.[20]

30.     For example, the trial brief in *Ott v. Ford Motor Co.* ("*Ott*") explained with respect to a model year 2000 F-250 Super Duty:

---

[19] *See, e.g.*, *Wurm v. Ford Motor Co.*, No. 2:18-cv-02322 (D. Kan.) (crushed roof on 1999 F-250 Super Duty); *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Ma.) (crushed roof in 2002 F-250 Super Duty) (*see*, *Taylor*, Dkt. No. 97); *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga.) (crushed roof on 2001 F-350 Super Duty) (*see*, *Gibson*, Dkt. No. 177-1); *Pena v. Ford Motor Co.*, No. 4:2008-cv-00501 (D. Ariz.) (crushed roof in F-250 Super Duty); *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky.) (crushed roof in 2000 F-250 Super Duty) (*see*, *Ott*, Dkt. No. 76-2); *Aguirre v. Ford Motor Co.*, No. 7:15-cv-00063 (W.D. Tex.) (crushed roof in 2006 F-350 Super Duty).

[20] *See, e.g.*, *Wurm v. Ford Motor Co.*, No. 2:18-cv-02322 (D. Kan.) (crushed roof on 1999 F-250 Super Duty); *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Me.) (crushed roof in 2002 F-250 Super Duty) (*see*, *Taylor*, Dkt. No. 97); *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga.) (crushed roof on 2001 F-350 Super Duty) (*see*, *Gibson*, Dkt. No. 177-1); *Pena v. Ford Motor Co.*, No. 4:2008-cv-00501 (D. Ariz.) (crushed roof in F-250 Super Duty); *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky.) (crushed roof in 2000 F-250 Super Duty) (*see Ott*, Dkt. No. 76-2); *Aguirre v. Ford Motor Co.*, No. 7:15-cv-00063 (W.D. Tex.) (crushed roof in 2006 F-350 Super Duty).

Ford admits it did not perform a physical roof strength test prior to the vehicle being sold—not a dolly rollover test, not a roof drop test and not a Federal Motor Vehicle Safety Standard ('FMVSS') 216 roof crush test. Ford claims it performed a computer version of the FMVSS 216 test, but it cannot find the test data or any test report. Litigation testing shows that not only did the F-250 roof fail to meet Ford's 10,500 pound roof strength design target, it also shows that the roof strength of its F-250 Super Duty truck is weaker that its smaller and lighter pickup trucks—the F-150 and Ranger."[21]

31.    *Ott* marshalled shocking evidence that Ford deliberately *reduced* the strength and structural integrity of the Super Duty roof system in order to save production costs and "enhance the corporate overall truck profitability."[22] The plaintiff in *Ott* included the following table of design changes made *pre-production* to the 1999 model year Super Duty:

**Pre-Production Design Changes in PHN-131 Roof Structure (between 3/31/94 program implementation and 1/05/98 Job #1)[8]**

| Design Change | Date | % Reduction | Savings |
|---|---|---|---|
| Downgage roof bow from 1 mm to 0.9 mm | Between 1/19/95 and 11/26/95 | 10% | Unknown |
| Downgage roof bow from 0.9 mm to 0.8 mm | 11/27/95 | 10.1% | Unknown |
| Delete front outer windshield header | 7/12/96 | ? | $3.50 per vehicle $500,000 tooling cost |
| Replace high strength Boron steel in SuperCab rear door vertical beam (floating B-pillar) with a mild steel | 12/10/96 | ? | $20.86 per vehicle $1,033,800 tooling cost |
| Downgage A-pillar from 2.5 mm to 2.4 mm | Between 5/20/97 and 1/05/98 | 4% | Unknown |

---

[21] *See*, *Ott*, No. 4:03-cv-00101, Dkt. No. 76-2, at 3.

[22] *See id.* at 7.

COMPLAINT FOR DAMAGES        - 14 -

32.     The plaintiff in *Ott* further detailed post-production design changes to the Super Duty roof structure that were implemented before plaintiff Ott's model year 2000 Super Duty was manufactured:[23] The plaintiff explained: "While the pre-production and post-production changes only equal $28.21 per vehicle, the overall profit to Ford is increased to millions of dollars. If Ford sells 100,000 vehicles per year for 9 years, this $28.21 translates to Ford profit in excess of $25 million!"[24]

### Post-Production Design Changes in the PHN-131 Roof Structure and Support (after January 5, 1998 Job #1 and before June 28, 2000 when Ott vehicle assembled)[9]

| Design Change | Date | % Reduction | $ Savings |
|---|---|---|---|
| Downgage A-pillar from 2.40 mm to 2.35 mm | 9/18/98 | 2% | 70¢ per vehicle (35¢ per A-pillar) |
| Downgage A-pillar from 2.35 mm to 2.20 mm | 3/30/99 | 6.4% | $1.72 per vehicle (86¢ per A-pillar) |
| Downgage SuperCab rear door vertical beam (floating B-pillar) from 1.50 mm to 1.20 mm | 6/15/99 | 20% | 96¢ per vehicle (48¢ per door) |
| Downgage inner windshield header from 1.20 mm to 1.07 mm | 8/10/99 | 11% | 17¢ per vehicle |
| Downgage roof bow from 0.80 mm to 0.74 mm | 8/10/99 | 7.5% | 10¢ per vehicle (5¢ per roof bow) |
| Downgage A-pillar reinforcement from 2.1 mm to 2.0 mm | 9/20/99 | 4.8% | 20¢ per vehicle (10¢ per A-pillar) |

33.     In the *Hill* case, where the jury awarded $1.7 billion in punitive damages, plaintiffs presented evidence that the Super Duty roof failed in Ford's internal testing, leading Ford engineers to develop a stronger alternative. But even

---

[23] *See id*. at 9.

[24] *See id.*

COMPLAINT FOR DAMAGES        - 15 -

though the alternative design was available as early as 2004, Ford elected not to use it in Super Duty trucks until the 2017 model year.[25]

34.    The pretrial order in *Hill* stated that "Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving 1999-2016 Super Duty trucks."[26]

35.    Another WSJ article on the *Hill* case noted that as early as 1989, NHTSA had proposed extended roof strength regulations that would apply to vehicles up to 10,000 pounds, which would include the Super Duty trucks.[27] But Ford (and its rival, GM) lobbied NHTSA to lower the threshold to 8,500 pounds, which would exclude the Super Duty trucks from the requirements.[28]

36.    According to the WSJ, "The auto maker argued that for heavier vans and trucks—those with a gross weight of over 8,500 pounds—there was insufficient evidence to determine that the stiffer requirements would enhance the safety of these vehicles."[29]

37.    Ford plainly knew the Roof-Crush Defect Vehicles contained the Roof-Crush Defect and it should have warned or disclosed this fact to Plaintiffs before selling, leasing, or providing the vehicle.

---

[25] *Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict*, WSJ (Aug. 22, 2022), available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last visited Sept. 1, 2022).

[26] *See* Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[27] *See Ford Trucks Highlighted in $1.7 Billion Verdict Weren't Subject to Tougher Safety Rules*, WSJ (Aug. 25, 2022), available at: https://www.wsj.com/articles/ford-trucks-in-1-7-billion-verdict-werent-subject-to-tougher-safety-rules-11661439150 (last visited Sept. 1, 2022).

[28] *See id.*

[29] *Id.*

**B.    Ford knew of the Roof-Crush Defect and never disclosed the Roof-Crush Defect to Plaintiff**

**1.    Ford knew the relationship between roof strength and rollover injury severity before the Roof-Crush Defect Vehicles were developed.**

38.    In 1960, Ford conducted a dynamic rollover test of a Ford Falcon to evaluate the car's roof structure. The design of the car's windshield header was a "hat section"—an open section design that is very similar to the design in many cars and SUVs throughout the 1970s to the present.[30]

39.    During the Falcon test, Ford found, "[t]he roof structure proved inadequate. The front of the roof collapsed. The hat section reinforcement at the very front of the roof was insufficient to withstand the load."[31]

40.    Ford emphasized the relationship between strong roofs and safe cars as early as 1964. An advertisement for the 1964 Country Squire station wagon depicted nine children on the car's roof and claimed "How long a life your car body has depends on how solidly it's built …. That's why all Ford-built cars give you so much extra reinforcing. Take the roof these youngsters are perched on. Three separate steel braces make it super-solid to sit on (or ride under)."[32]

41.    In the late 1960s, shoulder belts became mandatory, and Ford was concerned about the relationship between roof crush and belted occupants who would be seated upright as a vehicle rolled over.[33]

---

[30] Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[31] *Id.*

[32] 1964 Ford Country Squire station wagon advertisement, available at: https://www.adclassix.com/ads/64fordcountrysquire.htm (last visited February 6, 2023).

[33] Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

COMPLAINT FOR DAMAGES         - 17 -

42.    In 1968, Ford issued an intra-company safety evaluation entitled "Roof Strength Study" or "the Weaver memo." Ford noted, "Roof intrusion may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints. People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."[34]

43.    The Roof Strength Study identified the risk posed to belted occupants by rollover crashes. "It seems unjust to penalize people wearing effective restraint systems by exposing them to more severe rollover injuries than they might expect with no restraints."[35]

44.    On June 25, 1968, Ford published an intra-company safety evaluation entitled "Rollover Accidents; A Basis for Establishing Future Roof Strength Performance Requirements." The evaluation indicated that rollover accidents were far more likely to result in fatalities than front, side, or rear collisions. The report also noted, "[m]any vehicles come to rest on the roof after rollover over [sic]. The roof therefore must support the weight of the vehicle." And the report made a critical recommendation: "It is recommended that roof structure, when subjected to the static roof crush test, support twice the weight of the vehicle while restricting deformation to a value to be determined by a proposed test fixture."[36]

45.    In 1969, the consequences of crushed roofs also became clear to federal regulators. "Approximately 1,400 motor vehicle occupants were killed in that year by impact with roof structure in rollover accidents," the National Highway Safety

---

[34] *Id.*

[35] *Id.*

[36] Plaintiffs' Motion for Leave to File Third Amended Complaint to Add Putative Damages Claims Against Defendant Ford Motor Company at 84-87, *Welday v. Ford Motor Company*, No. 19CV33212 (Feb. 15, 2022).

Bureau, which later became the National Highway Traffic Safety Administration, or NHTSA, said in 1971.[37]

46.     On January 6, 1971, federal regulators proposed a safety standard to "reduce deaths and injuries due to the intrusion of the roof into the passenger compartment in rollover crashes."[38]

47.     Regulators initially proposed testing both front corners of a passenger vehicle roof. To pass the test, a car's roof could not have more than five inches of intrusion into the passenger compartment.[39]

48.     General Motors (GM) and the Automobile Manufacturers Association (AMA) subsequently submitted comments to the National Highway Safety Bureau arguing for changes that weakened the proposed test procedures.[40]

49.     Ford was a member of the Automobile Manufacturers Association.[41]

50.     Much like Big Tobacco contradicted its own science that showed smoking was deadly, "Ford questioned whether crushed roofs even posed a danger — a direct contradiction of its own 1968 study. 'The data do not implicate top

---

[37] *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[38] *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at: https://www.citizen.org/sites/default/files/industry_undermines_roof_strength_standard_of_1971.pdf (last visited Sept. 23, 2022).

[39] *Id.*

[40] *Id.*

[41] Article regarding Alliance of Automobile Manufacturers, available at: https://www.automotive-fleet.com/encyclopedia/alliance-of-automobile-manufacturers (last visited Sept. 23, 2022).

COMPLAINT FOR DAMAGES          - 19 -

intrusion as an automotive safety problem,' Ford said in its April 5, 1971, comments to the agency."[42]

51.     NHTSA published its *minimal* requirement for roof crush resistance in December 1971, Motor Vehicle Safety Standard 216 (FMVSS 216). "The final standard reflects, almost without change, the modifications to the rule that had been suggested by GM and the AMA."[43]

52.     Although the agency adopted a watered-down version of FMVSS 216, it still recognized the importance of roof strength in its rulemaking notices. The agency found, "serious injuries are more frequent when the roof collapses" and "It has been determined, therefore, that improved roof strength will increase occupant protection in rollover crashes."[44]

53.     In 1982, NHTSA issued a report, *Light Vehicle Occupant Protection—Top and Rear Structures and Interiors*. This comprehensive analysis found "accident statistics show that the degree of roof intrusions is highly associated with occupant injury severity and rate."[45]

54.     NHTSA and the Department of the Air Force's Armstrong Laboratory published the report *Vehicle and Occupant Response in Rollover Crash Tests* in 1992. This report published findings from twenty-four rollover crashes that NHTSA had sponsored to study vehicle and occupant dynamics. The report concluded, "Most of

---

[42] *U.S.: Danger Overhead: Crushed Roofs, Thousands killed, hurt as auto roofs collapse,* available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited Sept. 23, 2022).

[43] *Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971*, available at: https://www.citizen.org/sites/default/files/industry_undermines_roof_strength_standard_of_1971.pdf (last visited Sept. 23, 2022).

[44] Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[45] *Id.*

COMPLAINT FOR DAMAGES          - 20 -

the tests resulted in significant roof crush. Often the body was trapped by the roof crush. In these cases, the head/neck system was vulnerable to large loads from the roof."[46]

55.    In 1994, Australian scientists published *Rollover Crash Study on Vehicle Design and Occupant Injuries*. One of the report's "main conclusions" was "[i]n mass data and other crash collections, the weight of evidence is in agreement with a relationship between roof crush and occupant injury. There is a convincing relationship between rollover and spinal cord injury. Finally, there is strong evidence of a connection between local roof crush and spinal cord injury."[47]

56.    With respect to other popular vehicles in Ford's offerings, Ford admitted and promoted the notion that strong roof structures were important. In advertisements for the 1994 Ford Mustang, Ford touted the car's "Reinforced Roof Structure" and highlighted "[t]he A-pillars of both the coupe and convertible are reinforced. And, on the coupe, key areas of the roof are also reinforced to resist collapse in a rollover-type accident."[48]

**2.    Ford ignored the importance of roof strength in preventing serious injury and death when designing the Roof-Crush Defect Vehicles.**

57.    In the 1990s, Ford divided their pickup truck business into the PN96 and PHN131 platforms. The PN96 trucks have a GVWR of 8,500 lbs. or less. The PHN131 trucks have a GVWR over 8,500 lbs.[49]

---

[46] *Id.*

[47] Monash University study titled *Rollover Crash Study – Vehicle design and occupant injuries*, available at: https://www.monash.edu/muarc/archive/our-publications/reports/muarc065 (last visited Sept. 23, 2022).

[48] Byron Bloch, *Protecting Occupants in Rollover Crashes: Case Examples and Latest Technologies*, available at: https://www-esv.nhtsa.dot.gov/Proceedings/22/files/22ESV-000344.pdf (last visited Sept. 23, 2022).

[49] *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 8.

COMPLAINT FOR DAMAGES        - 21 -

58.    Ford's PHN131 platform includes the F-250, F-350, F-450, and F-550 Super Duty trucks. Thus, the Roof-Crush Defect Vehicles are PHN131 platform vehicles.[50]

59.    The PHN131 platform is available in three cab configurations: Regular Cab (2 door), SuperCab (4 door, with full-size front doors and short back doors, with the front and back doors opening in opposite directions), and Crew Cab (4 doors). The Regular Cab has an A-pillar and B-pillar. The SuperCab has an A-pillar and C-pillar. The Crew Cab has an A-pillar, B-pillar, and C-pillar.[51]

60.    On April 17, 1991, NHTSA issued a rule that extended FMVSS 216 to light trucks, vans, buses, and multipurpose passenger vehicles (MPVs) with a Gross Vehicle Weight Rating (GVWR) of 6,000 lbs. or less. The agency specifically declined to extend the standard to light trucks, vans, buses, and MPVs with a GVWR of up to 10,000 lbs.[52]

61.    Beginning in 1991, Ford's internal safety guidelines extended the requirement for FMVSS 216 testing to trucks with a GVWR of less than 8,500 lbs.[53]

62.    In 2009, NHTSA issued a new roof crush standard, FMVSS 216a. This new standard applies to passenger cars, MPVs, trucks, and buses with a GVWR of 10,000 lbs. or less.[54]

63.    Under FMVSS 216a, vehicles greater than 6,000 lbs. are required to withstand 1.5 times the unloaded vehicle weight of the vehicle.[55]

---

[50] *Ott*, No. 4:03-cv-00101, Dkt. No. 76-2, at 6.

[51] *Id.*

[52] *1971 Roof Strength Standard: 33-Year Old Standard Does Not Provide Basic Rollover Crashworthiness Protections*, available at: https://www.citizen.org/sites/default/files/chron_roof_crush.pdf (last visited Sept. 23, 2022).

[53] *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.

[54] 49 C.F.R. § 571.216a (2018).

[55] *Id.*

64.     Bruno Barthelemy was the engineering supervisor responsible for the design and development of the PHN131 body shell from January 1993 to June 1995.[56]

65.     A vehicle's body shell is the structure that surrounds the occupants of a vehicle, including the doors, roof, pillars, roof rails, windshield header, rear header, windshield, and rear window.[57]

66.     Barthelemy led the engineering team responsible for setting a roof strength target for the PHN131 vehicles.[58]

67.     Because there were no federal or internal Ford guidelines that set a target roof strength for the PHN131 vehicles, Barthelemy and his team decided the PHN131 roof strength needed to be as good as the PN96 (Ford's lighter, smaller F-150).[59]

68.     The target roof strength for the PHN131 vehicles was one-and-a-half times the vehicle's maximum unloaded weight.[60]

69.     The one-and-a-half times maximum vehicle unloaded weight target did not include a factor that considered variations in manufacturing.[61]

70.     Barthelemy's design focus was not safety. The target roof strength was required because "[t]he engineers needed some kind of target from a structural engineering point of view. They need a target so they could say this is enough or they need to continue, so that is how they set the target up."[62]

71.     Barthelemy knew that in many accident situations a rollover was inevitable when designing the PHN131 body shell.[63]

---

[56] *Taylor*, 1:06-cv-00069, Dkt. No. 86 at 20.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* at 21.

COMPLAINT FOR DAMAGES          - 23 -

72.     Richard Vanker, body engineering manager for the PHN131 platform (including the Roof-Crush Defect Vehicles) between January 1996 and June 1998, knew it was statistically foreseeable that PHN131 vehicles would be involved in rollovers. He knew that high center of gravity vehicles were more likely to rollover than standard passenger cars.[64]

73.     Despite this knowledge, no physical roof crush testing was ever performed on PHN131 vehicles (including Roof-Crush Defect Vehicles) before they were sold to the public.[65]

74.     In 1995, James K. Wagner, Automotive Safety and Engineering Standards FAO at Ford, described why physical roof crush testing was not performed on the PHN131 vehicles.[66]

75.     In a message entitled "PHN131 Safety PAT Mtg. Recap – 1/19/95" Wagner noted, "The LAW applies only to vehicles of 6,000 lbs. GVW and under."; "The PHN131 Safety Panel Chart … merely stated that the vehicles would meet all Safety Design Guidelines."; "There are no roof crush requirements in the Heavy Truck Safety Design Guidelines."; "There are no Safety Design Guidelines covering vehicles of 8,501 through 19,999 lbs. GVW."[67]

76.     In the same message, Wagner also noted, "Work on the PHN131 roof crush model has been underway since June, concentrating on the 4-door SuperCab. The model itself was derived from that developed for the 3-door PN96 SuperCab which has been shown to correlate very well with actual tests . . .. On account of the relatively close correlation of the models and the PN96 simulation's effective approximation of actual test data and also the fact that there is no REGULATORY

---

[64] *Id.*

[65] *Id.*

[66] *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 3.

[67] *Id.*

COMPLAINT FOR DAMAGES          - 24 -

REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs. GVW, no actual tests are planned."[68]

77.     Thus, after Ford successfully lobbied federal regulators not to impose a roof strength regulation on big trucks like the Roof-Crush Defect Vehicles, Ford then used this lack of regulation as its own internal excuse to build the Roof-Crush Defect Vehicles with extraordinarily weak roof structures. Later, Ford declined to even measure just how weak they actually were.

78.     In lieu of a physical test, Ford used Computer Aided Engineering (CAE) to model the PHN131's roof strength.[69]

79.     Information about the roof strength of the PHN131, as it was determined by CAE, is available in a series of memos addressed to Barthelemy.[70]

80.     The October 11, 1994 memo indicated that CAE analysis of an X-shaped roof bow yielded an increase in peak roof crush resistance from 9,600 lbs. to 10,600 lbs.[71]

81.     The October 26, 1994 memo indicated that placing a proposed X-shaped roof bow in the rear increased front roof crush peak resistance by 1,100 lbs. and rear roof crush resistance by 1,700 lbs. with a weight penalty of 1.5 lbs. The resultant roof crush resistances were 10,700 lbs. in the front and 10,400 lbs. in the rear.[72]

---

[68] *Id.*

[69] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 21.

[70] *Id.*; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[71] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[72] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

82.     The January 19, 1995 memo reported the CAE analysis of placing an X-shaped roof bow in the rear and a second bow in the front. The resultant roof crush resistance was 10,980 lbs.[73]

83.     A second memo from January 19, 1995, reported the CAE analysis of placing two (non-X-shaped) roof bows in the roof. The resultant crush resistance was 10,000 lbs.[74]

84.     Despite this unrefuted evidence that the roofs could be strengthened using the X-shaped roof bows, they were never incorporated into the PHN131 because the engineers were meeting their self-imposed roof crush targets.[75]

85.     Ford's Analytical Sign-Off for PHN131 CP Design provides additional information about roof crush strength.[76]

86.     At the time the Analytical Sign-Off is submitted the design of the vehicle is totally done.[77]

87.     Attachment 6 to the Analytical Sign-Off, "PHN131 Safety Status," lists the target structural safety goals for the PHN131 vehicles. The Regular Cab is 9,600 lbs. The Super Cap is 10,500 lbs. The Crew Cab is 10,500 lbs.[78]

88.     On April 26, 1996, the "Status" of the Regular Cab roof crush strength was 9,648 lbs. The "Status" of the Super Cab strength was 10,600 lbs. The "Status" of the Crew Cab strength was 10,484 lbs.[79]

---

[73] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[74] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 22; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[75] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23; *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 15–25.

[76] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 23.

[77] *Id.*

[78] *Gibson*, No. 1:06-cv-01237, Dkt. No. 177-1 at 32.

[79] *Id.*

89.  Ford does not have a copy of the CAE test on which the Analytical Sign-Off for roof crush is based.[80]

90.  On July 1, 2003, for purposes of litigation, a third-party performed a roof crush test on a 2001 Ford F-250 Super Cab according to NHTSA FMVSS 216 testing procedure.[81]

91.  The result of that test was approximately 9,800 lbs.[82] This indicates that when a third-party conducted a physical roof crush test of a PHN131 vehicle it performed 800 lbs. lower than Ford indicated it would in the Analytical Sign Off.

92.  Ford uses the maximum possible Unloaded Vehicle Weight when assessing the roof strength to weight ratio (1.5:1) to assure all variants of a particular vehicle model comply with FMVSS 216.[83]

93.  According to Ford's own calculations submitted to NHTSA, the PHN131 Super Cab has a maximum possible Unloaded Vehicle Weight of 7,969 lbs. and would have to withstand a 14,344 lbs. load to meet the requirements of FMVSS 216.

94.  The 14,344 lbs. figure includes a 20% compliance margin.[84]

95.  According to the Ford Vehicle Information Matrix, the maximum possible Unloaded Vehicle Weight of the PHN131 vehicle line is 7,700 lbs.[85]

96.  The PHN131 vehicle line would need to withstand 11,550 lbs. to meet the requirements of FMVSS 216.[86]

---

[80] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 25.

[81] *Id.* at 23.

[82] *Id.*

[83] *Id.* at 24.

[84] *Id.*

[85] *Id.*

[86] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5.

97.     The PHN131 vehicle line would need to withstand 13,860 lbs. to meet the requirements of FMVSS 216 with a 20% compliance margin.[87]

98.     Thus, the target structural safety goals for the PHN131 vehicles in the Analytical Sign Off were—at a minimum—1,050 lbs. *below* the current requirements of FMVSS 216.[88]

**3.     Ford reduced the roof strength of PHN131 vehicles to save money.**

99.     Ford planned to reduce the cost of the PHN131 vehicle as early as January 1996.[89] And Ford planned to reduce the cost per unit by $358 six months after launch.[90]

100.    On July 12, 1996, Ford approved the deletion of the front header outer from the PHN131 vehicle's design.[91] The deletion of the windshield outer saved Ford $3.50 per vehicle and $500,000 in tooling costs.[92] Deletion of the front header outer weakened the windshield header.[93]

101.    When you downgauge steel, you reduce its thickness. When you reduce the thickness of steel, you lessen the structural capacity.[94] On August 8, 1999, Ford authorized a downgauge from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[95]

---

[87] This figure is the maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 plus 20%.

[88] This figure is the PHN131 vehicle line's maximum Unloaded Vehicle Weight (7,700 lbs.) multiplied by 1.5 (11,550 lbs.) subtracted from the highest target roof crush strength in the Analytical Sign Off (10,500 lbs.).

[89] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 26.

[90] *Id.*

[91] *Id.* at 27.

[92] *Id.*

[93] *Id.*

[94] *Taylor*, No. 1:06-cv-00069, Dkt. No. 86 at 29.

[95] *Id.* at 28.

COMPLAINT FOR DAMAGES          - 28 -

1       102.   On November 27, 1995, the roof bows (roof reinforcements) were

2   redesigned and redrawn. The new bow metal was 0.8 mm thick, downgauged from

3   0.9 mm. This was a reduction in thickness of 10.1%.[96]

4       103.   On August 10, 1999, a design change was approved that downgauged

5   the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and

6   resulted in a cost savings of $0.05 per bow or $0.10 per vehicle.[97]

7       104.   The A-pillar is the part of the vehicle to which the windshield and front

8   door hinges are attached.[98] As of May 1997, the PHN131 A-Pillar was designed to

9   be 2.5mm thick.[99] On September 18, 1998, Ford downgauged the A-Pillar from

10  2.4mm to 2.35mm. This was a downgauge of 2%, for a cost savings of $0.70 per

11  vehicle and no tooling cost.[100]

12      105.   On March 30, 1999, Ford approved a downgauge of the A-pillar from

13  2.35 mm to 2.2 mm. This was a downgauge of 6.4% with a cost savings of $0.86 per

14  A-Pillar or $1.72 per vehicle.[101]

15      106.   Internal Ford documents concluded that it is "primordial" to have a

16  strong B-pillar structure in order to meet a high roof crush load.[102]

17      107.   On December 4, 1996, Ford authorized the replacement of the Boron

18  steel rear door front vertical beam with a vertical beam made of mild steel. The

19  vertical beam is what Ford generically called the "floating B-pillar."[103] Boron steel

20

21

22  [96] *Id.*

23  [97] *Id.*

24  [98] *Id.* at 29.

25  [99] *Id.*

    [100] *Id.*

26  [101] *Id.*

27  [102] *Id.* at 18.

28  [103] *Id.* at 29.

is four or five times stronger than normal steel.[104] Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[105]

108.    On June 15, 1999, Ford authorized the downgauge of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgauge resulted in a savings of $0.48 per door or $0.96 per vehicle.[106]

109.    In sum, Ford significantly weakened the PHN131 roof structure when it deleted the front header outer, replaced the Boron steel B-pillar with mild steel, and downgauged the windshield header inner, roof bows, A-pillar, and rear front door vertical beam.

110.    Ford has no test results to show what effect any of the downgauges and changes in roof and door structure had on roof crush strength.[107]

111.    Ford did not even attempt to ascertain how much weaker its hunger for profits made the roof structures of the Roof-Crush Defect Vehicles.

112.    As late as 2005, Ford maintained the position (contrary to its own internal testing from the 1960s and 1970s) that roof crush does not cause injury. Susan Cischke, Ford's vice president for environmental and safety engineering said, "There is no data out there to suggest people are injured by a roof collapsing."[108]

113.    Ford has previously been found liable for sacrificing safety in pursuit of profits, most notably in relation to the Pinto's defective fuel tank.[109]

---

[104] *Id.* at 30.

[105] *Id.* at 29.

[106] *Id.* at 30.

[107] *Id.* at 31.

[108] *Not the Top of the Safety Priorities*, N.Y. TIMES (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited Sept. 23, 2022).

[109] *See, e.g.*, *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 771 (1981).

COMPLAINT FOR DAMAGES          - 30 -

114.   Ford has identified 162 lawsuits and 83 similar incidents of the roof crush involving the 1999–2016 Super Duty trucks.[110]

115.   Ford's rejection of its own tests and efforts to increase profits, as outlined above by purposefully degrading the strength of the roof both pre- and post-production of the first Roof-Crush Defect Vehicles, squarely evidences Ford's knowledge that the Roof-Crush Defect Vehicles had an unsafe and dangerous design from before the sale of the first 1999 model year Super Duty.

116.   All owners and lessees of the Roof-Crush Defect Vehicles have paid huge premiums for the supposed toughness, durability, and safety of their Super Duty vehicles. Because Ford sold them vehicles with the Roof-Crush Defect, they have all suffered ascertainable loss.

### 4.   Ford's ownership of Volvo provided further evidence the Roof-Crush Defect Vehicles were unsafe.

117.   Ford owned Volvo between 1999 and 2010.[111]

118.   Ford had access to the safety features and technologies used in Ford's Volvo division.[112]

119.   Volvo has a history of making roof strength a priority. In 1967, the company began reinforcing the roof support pillars of its 140 Series sedan.[113]

---

[110] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 88–123, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[111] *This is Volvo*, Volvo, available at: https://www.media.volvocars .com/us/en-us/corporate/this-is-volvo (last visited Oct. 7, 2022).

[112] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 27, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[113] *Not the Top of the Safety Priorities*, N.Y. Times (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited Sept. 23, 2022).

120.   When Volvo introduced its first sport utility vehicle in 2002, the XC90, they had a promotional video claiming the strength of the roof "exceeds the legal requirements in the U.S.A. by more than 100 percent."[114]

121.   The Volvo XC90 was sold as "a different S.U.V." with innovations to prevent and mitigate rollovers. A major feature of the car was a roof reinforced with high-strength boron steel. Volvo's internal documents show that the reinforced roof was a crucial component of the company's rollover protection strategy.[115]

122.   Ford's engineers in the Volvo division emphasized the importance of a strong roof structure with high integrity that would resist deformation.[116]

123.   These priorities were mirrored in advertisements for the 2002 XC90. "[Keeping] the passenger compartment intact is first of all a job for the vehicle's structure, including roof pillars and transverse roof profiles [i.e., roof bows]."[117]

124.   The roof on the 2002 XC90 was also built as a "safety cage" to ensure "survival space" for occupants in rollover crashes. This safety cage was "[a] rigid framework surrounding the occupants which creates a support for the interior safety equipment and provides a survival space for the vehicle occupants in case of a crash."[118]

125.   Rather than implement these safety features in Ford-branded vehicles, Ford engineers "told Volvo engineers in 2002 that they needed to de-emphasize

---

[114] *Id.*

[115] *Id.*

[116] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 29, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[117] *Id.* at 131.

[118] *Id.* at 30.

vehicle rooftop safety in order to get in line" with the position of their corporate parent.[119]

126.   Ford also refused to implement the roof safety features developed by Ford engineers.

127.   In preparation for litigation related to a Roof-Crush Defect Vehicle, Ford created a chart comparing the strength-to-weight ratio (SWR) of 30 Ford cars and trucks.[120]

128.   The chart shows that the F-250 Super Duty roof had the lowest SWR in Ford's entire fleet of vehicles.[121]

129.   Strength, weight, and SWR affect the forces experienced inside a vehicle during a crash. The magnitude of those forces is directly related to the Defect of injury.[122]

130.   Beginning in 2004, Ford organized a Roof Strength Task Force and assigned engineers to a project called the Enhanced Roof Strength Project (ERSP).[123] The purpose of the ERSP was to design a stronger and safer roof for Ford Super Duty trucks.[124] The ERSP developed a roof that could withstand 55,000 lbs. of force.[125]

---

[119] *Memos tell of Ford-Volvo safety dispute*, CNN (May 16, 2005), available at: http://www.cnn.com/2005/AUTOS/05/14/ford_volvo/ (last visited Oct. 7, 2022).

[120] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 68, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[121] *Id.*

[122] *Vehicle Size and Weight*, IIHS (July 2022), available at: https://www.iihs.org/topics/vehicle-size-and-weight#how-size-and-weight-affect-safety (last visited Oct. 7, 2022).

[123] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 2, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (Ga. St. Ct. Sept. 22, 2017).

[124] *Id.*

[125] *Id.*

131.   Beginning in model year 2009, Ford put the stronger and safer roof developed by the ERSP in F-150 trucks.[126] The model year 2009 F-150 brochure boasts that the truck has a new "high-strength safety cage structure" and that this was the "safest F-150 yet."[127]

132.   With the ERSP roof, the F-150 had a SWR ratio of 4.72.[128] But the supposedly durable and robust Super Duty Roof-Crush Defect vehicles had a SWR of just 1.1.[129]

133.   Rather than implementing the stronger and safer ERSP roofs, Ford concealed their existence and continued selling Super Duties with the Roof-Crush Defect for twelve years without warning anyone.

134.   Ford did not strengthen the roof of the Super Duty line until 2017 when new government regulations forced it to do so.[130]

135.   It is beyond question that Ford knew the weak roofs in Roof-Crush Defect Vehicles were severely injuring and killing people because one of Ford's own ERSP engineers admitted that this was the <u>exact</u> "problem" Ford was trying to "solve" by building stronger roofs.[131]

**C.    Facts Unique to Plaintiffs' Claims**

> **1. Ms. Reitz died after her roof 2001 Ford F-350 roof collapsed, causing blunt force trauma.**

136.   Ms. Reitz received her 2001 Ford F-350 as a gift from her grandfather.

---

[126] *Id.* at 3.

[127] *Id.* at 85-86.

[128] *Id.* at 34.

[129] *Id.*

[130] *Id.* at 33.

[131] *Id.* at 32-33.

137.    Ms. Reitz enjoyed the outdoors, spending time with her family, and participated in rodeos as a barrel racer. She was passionate about riding horses and performing.

138.    On June 19, 2017, Ms. Reitz was driving her 2001 Ford F-350 truck to a friend's house to collect some of her personal belongings. Ms. Reitz was traveling northbound on Park Hill Road, Santa Margarita in San Luis Obispo County.

139.    Ms. Reitz was not able to negotiate a left curve in the roadway and she lost control of her vehicle. The vehicle rotated and rolled on its roof, crushing the cab.

140.    She sustained fatal injuries because of the Roof-Crush Defect and was pronounced dead at the scene. Her cause of death was blunt force trauma injuries due to the roof collapse.[132]  She was twenty-five (25) years old.

141.    Ms. Reitz's death is the direct result of a defective roof design that Ford knew was extraordinarily weak.

142.    Below is a photo of Ms. Reitz's Ford F-350 taken after the incident. The collapsed roof and cab are clearly depicted.[133]



---

[132] *See* Exhibit 1, Certificate of Death, San Luis Obispo County.

[133] *See* Exhibit 2, (providing additional photos of Ms. Reitz's vehicle after the incident).

COMPLAINT FOR DAMAGES        - 35 -

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Delayed Discovery Rule Tolling

143.   Because Ford omitted the existence of the Roof-Crush Defect in its communications with the public, Plaintiffs had no way of knowing about the unreasonable risk of paralysis, grave injury or death that could result in the event of a rollover accident in the Roof-Crush Defect Vehicles.

144.   Plaintiff became aware of the Roof-Crush Defect during November of 2022 when the aforementioned Georgia verdict made this issue well known.

145.   Within the period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that Ford was omitting the Roof-Crush Defect complained of herein.

146.   Plaintiff could not discover, and could not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers and purposefully used secrecy clauses in settlements with owners of Roof-Crush Defect Vehicles; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable Defect of paralysis, grave injury or death of the Roof-Crush Defect Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

147.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Roof-Crush Defect Vehicles.

## VI.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## STRICT PRODUCT LIABILITY

## (ON BEHALF OF ALL PLAINTIFFS)

148.   Plaintiffs refer to all preceding paragraphs and incorporate them as though set forth in full in this cause of action.

149.   At all times relevant, Ford was involved in the design, manufacture, marketing, assembly and/or testing of the 2001 Ford F-350, and its component parts, in which Ms. Reitz was riding at the time of her death.

150.   Ford was responsible for placing the 2001 Ford F-350 into the stream of commerce in the State of California.

151.   It was reasonably foreseeable to Ford that vehicle rollovers similar to the one that claimed the life of Ms. Reitz would occur during the normal and ordinary use of its vehicles, including Ms. Reitz's 2001 Ford F-350.

152.   The vehicle in which Ms. Reitz was driving did not perform as safely as an ordinary consumer of the 2001 Ford F-350 would expect, despite the vehicle's use for its intended purpose.

153.   The roof system of the 2001 Ford F-350 in which Ms. Reitz was a driver was defectively manufactured, designed, assembled, marketed, engineered and/or tested. Critical components of the roof were replaced with weaker or less expensive parts. Consequently, the integrity of the roof was compromised and not able to withstand a rollover incident.

154.   The risks of the 2001 Ford F-350's design did not outweigh the benefits since Ford could have utilized safer alternative designs at the time Ms. Reitz 2001 Ford F-350 was designed, manufactured, and sold.

155.   The acts and/or omissions of Ford were a proximate cause of the death of Mikyley Reitz.

156.   The acts and/or omissions of Ford were a proximate cause of the Plaintiffs' damages, both individually and on behalf of the Estate of Mikyley Reitz.

### SECOND CAUSE OF ACTION

### NEGLIGENCE

### (ON BEHALF OF ALL PLAINTIFFS)

157.   Plaintiffs refer to all preceding paragraphs and incorporate them as though set forth in full in this cause of action.

158.   At all times relevant, Ford was involved in the design, manufacture, marketing, assembly and/or testing of the 2001 Ford F-350, and its component parts, in which Ms. Reitz was riding at the time of her death.

159.   At all times relevant, Ford owed Plaintiffs a duty to exercise reasonable care in the design, manufacture, marketing, assembly and/or testing of the 2001 Ford F-350, and its component parts, including a duty to ensure that the vehicle did not cause Plaintiffs, other users, bystanders and/or members of the public, unnecessary injury or death.

160.   It was reasonably foreseeable to Ford that collisions similar to the one involving Ms. Reitz would occur during the normal and ordinary use of its vehicles.

161.   Indeed, Ford knew about the Roof-Crush Defect well before the Roof-Crush Defect Vehicles went to market. Ford's knowledge is evidenced by: (1) its own internal investigations and documents from years before the release of the first Roof-Crush Defect Vehicle as further described below; (2) the rigorous pre-launch testing of the Roof-Crush Defect Vehicles; (3) the direct and public reports of deadly accidents involving Roof-Crush Defect Vehicles; (4) Ford's investigation of accidents involving the Roof-Crush Defect Vehicles; and (5) Ford's practice of secretly settling lawsuits involving such accidents, which hid the dangerous nature— and Ford's knowledge—of the Roof-Crush Defect.

162.   The injuries suffered by Plaintiffs occurred because the vehicle in which Ms. Reitz was traveling was not reasonably crashworthy and/or not reasonably fit to safely withstand foreseeable collisions or rollovers.

163.   Ford knew or should have known that the 2001 Ford F-350 in which Ms. Reitz was a passenger was unreasonably dangerous in the event it was involved in a collision like the one involving Ms. Reitz. Consequently, Ford was negligent and breached their duty of care to Plaintiffs in the following ways:

        a.    Ford failed to exercise due care in the design, manufacture, assembly, marketing, engineering and/or testing of the 2001 Ford F-350 in order to avoid the types of injuries experienced by Plaintiffs;

        b.    Ford failed to incorporate within the 2001 Ford F-350 reasonable safeguards, proper components, and safe engineering to avoid the roof from collapsing in the event of vehicle rollovers or collisions with other vehicles and fixed objects.

        c.    Ford failed to take adequate steps to identify and/or mitigate the safety Defects, including the Defects of the roof collapsing in the event of vehicle rollovers or collisions with other vehicles and fixed objects; and

        d.    Ford was otherwise careless or negligent in the design, manufacture, assembly, marketing, engineering and/or testing of the 2001 Ford 3-50.

164.   As a direct result of Ford's negligence, Plaintiffs suffered harm in an amount to be determined by a jury following trial.

**THIRD CAUSE OF ACTION**

**WRONGFUL DEATH**

**(ON BEHALF OF ALL PLAINTIFFS)**

165. Plaintiffs refer to all preceding paragraphs and incorporate them as though set forth in full in this cause of action.

166. As alleged throughout, Ms. Reitz died as a result of the defect, negligence, wrongful conduct and/or statutory violations of Defendant Ford under California Code of Civil Procedure 377.60.

167. Plaintiffs are the natural parents of Ms. Reitz and have been harmed and suffered damages.

168. Ms. Reitz had no children or spouse at the time of her death.

169. Plaintiffs seek general and special damages in connection with the loss of: financial support, gifts, benefits, services and for the pain suffering, mental and physical anguish, loss of care, comfort, society, companionship, advice and friendship of Ms. Reitz. Plaintiffs seek all damages permitted by law, including punitive damages, resulting from the wrongful death of Ms. Reitz in an amount to be proven at the time of trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court enter judgment against Defendant in the following fashion:

A. The full amount of Plaintiffs' economic damages;

B. The full amount of Plaintiffs' non-economic and/or general damages;

C. The full amount of damages suffered by the Estate of Mikyley Reitz;

D. Exemplary damages to the full extent allowed by law;

E. The full amount of Plaintiffs' damages for loss of consortium, society, companionship, advice, support guidance, or similar benefits, resulting from the wrongful death of Mikyley Rae Reitz;

F. Punitive damages;

G. Plaintiffs' attorneys' fees and costs to the extent allowable;

H. Prejudgment interest on Plaintiffs' damages; and

I.    Such other and further relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury as provided by Federal Rule of Civil Procedure 38.

Dated: February 7, 2023        HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Christopher R. Pitoun
   Christopher R. Pitoun
   301 N. Lake Avenue, Suite 920
   Pasadena, CA 91101
   Telephone: (213) 330-7150
   Facsimile: (213) 330-7152
   Email: christopherp@hbsslaw.com

   Jake Berman
   1301 Second Avenue, Suite 2000
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594
   Email:  jakeb@hbsslaw.com

*Attorneys for Plaintiffs*
*Rick Landers and Salinas Zarling,*
*Co-Administrators for Estate of*
*Mikyley Rae Reitz*